**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **MICHAEL FELDKAMP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.  2:24-cv-02220-JAR-TJJ** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE UNIVERSITY OF KANSAS** | ) | |
| **HOSPITAL AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT ON ALL CLAIMS ASSERTED**
**BY PLAINTIFF MICHAEL FELDKAMP**

# <u>TABLE OF CONTENTS</u>

I.     Nature Of The Matter Before The Court .................................................................. 1

II.    Statement Of Uncontroverted Material Facts ........................................................... 2

    Plaintiff's Employment with UKHA ...................................................................... 2

    Plaintiff's Historical Performance Issues .............................................................. 3

    Plaintiff's 2020 Performance Review .................................................................... 7

    Individuals Supposedly Out to Get Plaintiff .......................................................... 8

    One of Plaintiff's Direct Reports Complains about Plaintiff's Treatment ............ 9

    Employee Relations Investigation ....................................................................... 11

    Plaintiff Mishandles a Nuclear Camera Issue ..................................................... 16

    Other Employees Report Concerns with Treadmills ........................................... 17

    Lead up to Termination of Plaintiff's Employment ............................................ 20

    Plaintiff's Termination ......................................................................................... 22

III.   Argument And Authorities ..................................................................................... 23

    **A.**   Standard of Review ...................................................................................... 23

    **B.**   Plaintiff has not satisfied and cannot satisfy the proof required for his
          ADEA discrimination claim to proceed .......................................................... 24

    **C.**   Plaintiff's ADEA discrimination claim fails at the *prima facie* stage. ............. 25

         1.   The record demonstrates that by the end of his employment,
               Plaintiff was not performing his position satisfactorily ....................... 26

    **D.**   Plaintiff's employment was terminated for legitimate, non-discriminatory
          reasons .......................................................................................................... 28

    **E.**   Plaintiff cannot establish pretext with respect to the termination of
          Plaintiff's employment .................................................................................. 29

    **F.**   Plaintiff cannot establish that his termination violated K.S.A. § 65-4928. ...... 31

         1.   Plaintiff did not report a reportable incident in accordance with the
               statute's language .................................................................................. 31

         2.   Plaintiff was not discharged or terminated for making a report. .......... 33

IV.    Conclusion .............................................................................................................. 33

102952139.4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Allegion, PLC,*
  No. 19-cv-02420-TC, 2022 WL 764432 (D. Kan. Mar. 11, 2022)........................................27

*Adler v. Wal-Mart Stores, Inc.*,
  144 F.3d 664 (10th Cir. 1998) ...............................................................................................23

*Anglemyer v. Hamilton Cnty. Hosp. Carter*,
  No. 81,417, 2000 WL 36745791 (Ct. App. Kan. Feb. 11, 2000) ...........................................31

*Bones v. Honeywell, Int'l, Inc.*,
  366 F.3d 869 (10th Cir. 2004) ...............................................................................................23

*Bryant v. Farmers Ins. Exch.*,
  432 F.3d 1114 (10th Cir. 2005) .............................................................................................29

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................................23

*DePaula v. Easter Seals El Mirador*,
  859 F.3d 957 (10th Cir. 2017) ...............................................................................................29

*EEOC v. Prudential Fed. Sav. & Loan Ass'n*,
  763 F.2d 1166 (10th Cir. 1985) .............................................................................................24

*Ford v. Jackson Nat'l Life Ins. Co.*,
  45 F.4th 1202 (10th Cir. 2022) ..............................................................................................28

*Frappied v. Affinity Gaming Black Hawk, LLC*,
  966 F.3d 1038 (10th Cir. 2020) .......................................................................................25, 28

*Furr v. Seagate Tech., Inc.*,
  82 F.3d 980 (10th Cir. 1996) .................................................................................................23

*Janzen v. Portfolio Recovery Assocs., L.L.C.*,
  Case No. 21-cv-1107-EFM, 2022 WL 4182314 (D. Kan. Sept. 13, 2022) ............................25

*Jaramillo v. Colo . Jud. Dep't*,
  427 F.3d 1303 (10th Cir. 2005) .............................................................................................29

*Johnson v. Weld Cnty., Colo.*,
  594 F.3d 1202 (10th Cir. 2010) .............................................................................................29

102952139.4

*Jones v. Denver Post Corp.*,
  203 F.3d 748 (10th Cir. 2000) .................................................................................23

*Jones v. Okla. City Pub. Sch.*,
  617 F.3d 1273 (10th Cir. 2010) ........................................................................24, 29

*Kelly-Koffi v. Wesley Med. Ctr.*,
  241 F. Supp. 2d 1289 (D. Kan. 2003)........................................................................27

*Lewis v. Twenty-First Century Bean Processing*,
  638 Fed. App'x 701 (10th Cir. 2016) .......................................................................25

*Markley v. U.S. Bank Assoc.*,
  59 F.4th 1072 (10th Cir. 2023) .................................................................................30

*Morgan v. Hilti, Inc.*,
  108 F.3d 1319 (10th Cir. 2007) ................................................................................25

*Pacheco v. Whiting Farms, Inc.*,
  365 F.3d 1199 (10th Cir. 2004) ................................................................................24

*Panis v. Mission Hills Bank, N.A.*,
  60 F.3d 768 (10th Cir. 1988) ....................................................................................23

*Parker v. Life Care Ctrs. of Am., Inc.*,
  No. 04-1206-MLB, 2006 WL 8440524 (D. Kan. Mar. 31, 2006) ...........................31

*Riggs v. AirTran Airways, Inc.*,
  497 F.3d 1108 (10th Cir. 2007) ................................................................................24

*Sanchez v. Denver Pub. Sch.*,
  164 F.3d 527 (10th Cir. 1998) ..................................................................................24

*Stone v. Autoliv ASP, Inc.*,
  210 F.3d 1132 (10th Cir. 2000) ................................................................................24

*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs, Inc.*,
  259 F.3d 1226 (10th Cir. 2001) ................................................................................23

*Wingerd v. Kabooworks Servs., LLC*,
  Case No, 18-CV-2024-JAR-KGG, 2019 WL 1171700 (D. Kan. Mar. 13,
  2019) ........................................................................................................................23

*Wright v. Wyandotte Cnty. Sheriff's Dept.*,
  963 F. Supp. 1029 (D. Kan. 1997)............................................................................24

**Statutes**

Age Discrimination in Employment Act of 1967 .......................................1, 24, 25, 33

Kan. Stat. Ann. § 65-4921, 4923, 4928 ...................................................................1, 2, 24, 31, 33

Kansas Risk Management Act ...............................................................................................1, 31

**Other Authorities**

Fed. R. Civ. P. 56.................................................................................................................1, 23

Local Rule 56.1 ..........................................................................................................................1

102952139.4

Defendant the University of Kansas Hospital Authority ("UKHA"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, offers this Brief in Support of its Motion for Summary Judgment.

## I.    NATURE OF THE MATTER BEFORE THE COURT

This employment discrimination case involves two claims. Plaintiff Michael Feldkamp ("Plaintiff") alleges (1) he was discriminated against in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and (2) wrongfully terminated in violation of the Kansas Risk Management Act, specifically K.S.A. § 65-4928. Both claims fail as a matter of law.

Plaintiff was not terminated because of his age nor terminated for allegedly complying with the Kansas Risk Management Act. Rather, Plaintiff's employment was terminated because he had concerning performance issues and demonstrated operational misjudgment within the last five years of his employment. Specifically, Plaintiff created an environment of fear, retaliation, and mistrust among the Nuclear Medicine staff and hospital staff.

Instead of being based on facts, Plaintiff relies on his own speculation, subjective beliefs, and conspiracy theories about colleagues whom he believed were "out to get" him. Rather than produce evidence to support his claims, Plaintiff accuses people of talking and gossiping together, creating a "mob mentality" of people who talked with Human Resources. Plaintiff's subjective beliefs are unsupported by the record. UKHA provides ample, uncontroverted evidence to support its decision to terminate Plaintiff's termination based on legitimate, non-discriminatory, and non-retaliatory reasons.

Plaintiff cannot demonstrate a *prima facie* case of age discrimination under the ADEA and, even if he could, Plaintiff cannot establish UKHA's decision regarding his termination of employment was a pretext for intentional discrimination. Nor can Plaintiff demonstrate that his termination was retaliation for compliance with the Kansas Risk Management Act. There is no evidence that Plaintiff's age or making of an alleged report was the cause of the termination of his

1

employment. Accordingly, Plaintiff's claims of age discrimination and wrongful termination in violation of K.S.A. § 65-4928 fail as a matter of law and summary judgment should be granted in UKHA's favor.

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS[1]

**Plaintiff's Employment with UKHA**

1.      The University of Kansas Hospital Authority is a healthcare system providing healthcare to residents of Wyandotte County, Kansas, the metropolitan Kansas City area, and the nation. **Ex. H, Declaration of Cecily Wilkinson (Wilkinson Dec.) at ¶ 6.**

2.      UKHA does not discriminate against any employee or applicant on the basis of race, color, religion, sex, national origin, age or any other characteristics protected by law. **Ex. H, Wilkinson Dec. at ¶ 7.**

3.      Plaintiff began employment with UKHA in 1991. **Doc. 48 (Pretrial Order) at § 2.a.i.**

4.      Until Plaintiff was terminated on or about February 6, 2023, Plaintiff was employed as the Nuclear Cardiology Director. **Doc. 48 at §§ 2.a.ii-iii.**

5.      Plaintiff was 63 years old at the time of his termination. **Ex. A, Deposition of Plaintiff Michael Feldkamp (Pl. Dep.) 6:1-3.**

6.      As Nuclear Cardiology Director, Plaintiff's job responsibilities included supervising employees. **Ex. A, Pl. Dep. 47:11-48:2; Ex. C, Deposition of Barbara MacArthur (MacArthur Dep.) 12:2-5.**

---

[1] UKHA sets forth the following uncontroverted facts obtained through discovery in this matter. These facts are presented as admitted solely for the purposes of summary judgment. Some facts and the propositional guideposts are included for the convenience of the Court to provide background and context.

7.      Plaintiff was also responsible for managing schedules and staffing; ensuring adherence to regulatory compliance standards; and tracking credentialing requirements. **Ex. A, Pl. Dep. 141:2, 236:8-17; Ex. C, MacArthur Dep. 54:2-55:6.**

8.      From September 2018 until the end of his employment, Becky Captain was Plaintiff's direct supervisor. **Ex. B, Deposition of Becky Captain (Captain Dep.) 13:13-14:13.**

9.      Captain reported to Barbara MacArthur. **Ex. B, Captain Dep. 11:3-7.**

10.      At the time Plaintiff's employment ended, Becky Captain was the Director of Cardiovascular Clinical Practice and Barbara MacArthur was the Vice President of Cardiac Services. **Doc. 48 at §§ 2.a.iv-v; Ex. C, MacArthur Dep. 7:9-17; Ex. B, Captain Dep. 8:23-9:10.**

11.      Currently, Becky Captain is 55 years old, and Barbara MacArthur is 72 years old. **Ex. B, Captain Dep. 12:20; Ex. C, MacArthur Dep. 55:20.**

12.      The following individuals, according to Plaintiff's own organizational chart, reported to Captain in the latter half of 2022: Alice Mott, date of birth January 9, 1957; Shelli Mundziak, date of birth April 1, 1959; Sue Nordhues, date of birth January 12, 1960; Dora Diaz, date of birth February 22, 1974; Jenny Pearson, date of birth October 10, 1977; Heather Rowland, date of birth September 17, 1978; Holly Grier, date of birth March 16, 1979; Melissa Fowler, date of birth February 26, 1983; and Ashley Carnes, date of birth May 1, 1985. **Ex. A, Pl. Dep. 222:1-25, Exhibit 3 (FELDKAMP_001264); Ex. H, Wilkinson Dec. at ¶ 15.**

13.      Except for two individuals, every employee who reported to Captain in late 2022 was over the age of 40. **Ex. A, Pl. Dep. 222:1-25, Exhibit 3 (FELDKAMP_001264); Ex. H, Wilkinson Dec. at ¶ 15.**

**<u>Plaintiff's Historical Performance Issues</u>**

14.     In 2017, the Joint Commission, the certification body responsible for organizational safety surveys, found out-of-date protocols and policies in Plaintiff's department. **Ex. A, Pl. Dep. 180:1-182:5, 228:11-13; Ex. C, MacArthur Dep. 17:22-21:5.**

15.     The protocols were not formatted or updated in accordance with organizational policies, creating a risk to patient care. **Ex. C, MacArthur Dep. 17:22-21:5.**

16.     The surveyor alerted MacArthur and the Medical Director and gave the department until 7:30 a.m. the following morning to create an improvement plan due to the high risk to patients the outdated protocols created. **Ex. C., MacArthur Dep. 21:1-5.**

17.     MacArthur and the Medical Director spoke with Plaintiff about the inappropriateness of the situation. **Ex. C, MacArthur Dep. 20:23-21:16.**

18.     However, attempts to provide coaching or feedback to improve Plaintiff's performance were "impossible," as Plaintiff was unreceptive to feedback or coaching. **Ex. B, Captain Dep. 15:17-16:13.**

19.     For example, despite MacArthur and the Medical Director speaking with Plaintiff about the unacceptable protocols, Plaintiff still denied that he was responsible for those protocols within his department. **Ex. C, MacArthur Dep. 20:23-21:16; Ex. A, Pl. Dep. 181:1-182:7.**

20.     This response was typical of Plaintiff—Captain testified that, when Plaintiff received feedback, he would "obsess[] . . . and leaders, staff, everybody would know about it" and believe "it was a conspiracy or someone out for someone." **Ex. B, Captain Dep. 15:17-16:13.**

21.     In the fall of 2019, Plaintiff was disrespectful toward an echocardiogram nurse, Spring Palcher. **Ex. A, Pl. Dep. Exhibit 6 (UKHA_000001-2, 572-576, 579-584); Doc. 48 at §§ 2.b.ix-xi.**

22.    On October 8, 2019, Palcher and Plaintiff disagreed about where to store linens due to a shortage of storage space. **Ex. A, Pl. Dep. 298:23-299:15; Ex. B, Captain Dep. 68:20-69:10; Ex. A, Pl. Dep. Exhibit 6 (UKHA_000001-2); Doc. 48 at § 2.b.ix.**

23.    Palcher and Plaintiff had a "confrontation" about trying to find a space for the linens, during which Plaintiff became frustrated with Palcher. **Ex. A, Pl. Dep. 298:23-299:15; Ex. B, Captain Dep. 68:20-69:10; Ex. A, Pl. Dep. Exhibit 6 (UKHA_000001-2); Doc. 48 at § 2.b.ix.**

24.    Palcher described Plaintiff as unprofessional and intimidating. **Ex. B, Captain Dep. 68:20-69:10; Ex. A, Pl. Dep. Exhibit 6 (UKHA_000001-2); Doc. 48 at § 2.b.ix.**

25.    Palcher believed Plaintiff was in her personal space and raised his voice at her. **Ex. B, Captain Dep. 68:20-69:10; Ex. A, Pl. Dep. Exhibit 6 (UKHA_000001-2); Doc. 48 at § 2.b.ix.**

26.    Plaintiff admitted he had a "confrontation" with Palcher regarding the linens. **Ex. A, Pl. Dep. 298:23-299:15.**

27.    Plaintiff also admitted he was frustrated with echo nurses because of linen storage and moving linens around. **Ex. A, Pl. Dep. 299:5-14.**

28.    Plaintiff admitted that he did not know whether his voice was raised during the "confrontation." **Ex. A, Pl. Dep. 300:11-16.**

29.    On or around October 14, 2019, Palcher complained to Employee Relations about Plaintiff's behavior toward her. **Ex. A, Pl. Dep. Exhibit 6 (UKHA_000574); Doc. 48 at § 2.b.xi.**

30.    On October 21, 2019, just six days after Palcher reported her concerns to Employee Relations, Plaintiff sent a memorandum with the subject "Spring Palcher/Linen Issue" to Dr. Thomas Rosamond, Director of Nuclear Cardiology; Becky Captain; and Jane Gonzalez, Employee Relations Consultant. **Ex. A, Pl. Dep. 302:4-16, 303:3-7, Exhibit 6 (UKHA_000579-84); Doc. 48 at § 2.b.x.**

31.    Plaintiff wrote the memorandum "[a]fter hearing that [Palcher] told other nurses that she went to HR and said that we had a hostile environment in nuclear." **Ex. A, Pl. Dep. 302:8-303:7, Exhibit 6 (UKHA_000579-84); Doc. 48 at § 2.b.x.**

32.    Plaintiff received coaching about remaining calm to effectively lead situations like the one with Palcher, but Plaintiff did not believe he did anything wrong. **Ex. A, Pl. Dep. Exhibit 6 (UKHA_000572); Doc. 48 at § 2.b.xi.**

33.    Feldkamp was also disrespectful and unprofessional to environmental services employees. **Ex. B, Captain Dep. 69:11-14.**

34.    In November 2020, Captain, Plaintiff's supervisor, received an email from Jeff Novorr, Vice President of Support Operations, escalating an interaction between Plaintiff and Regina Steward, a housekeeper. **Ex. A, Pl. Dep. 295:10-297:4, Exhibit 7 (UKHA_000004-5); Doc. 48 at § 2.b.xii; Ex. B, Captain Dep. 69:15-70:3.**

35.    At the time, Steward had recently undergone a hip replacement and was reacclimating to work. **Ex. A, Pl. Dep. 295:10-297:4, Exhibit 7 (UKHA_000004-5); Doc. 48 at § 2.b.xii; Ex. B, Captain Dep. 69:15-70:3.**

36.    Plaintiff "began demanding the floor be mopped" while Plaintiff was on the phone regarding her medical leave. **Ex. A, Pl. Dep. 295:10-297:4, Exhibit 7 (UKHA_000004-5); Doc. 48 at § 2.b.xii; Ex. B, Captain Dep. 69:15-70:3.**

37.    Even though Plaintiff tried to instruct Steward on how to perform her job, Plaintiff was not Steward's supervisor. **Ex. A, Pl. Dep. 298:21-22.**

38.    Steward was "very upset" because of the interaction and said she was "tired of dealing with [Plaintiff] and this type [of very rude] behavior." **Ex. A, Pl. Dep. 295:10-297:4, Exhibit 7 (UKHA_000004-5); Doc. 48 at § 2.b.xii; Ex. B, Captain Dep. 69:15-70:3.**

6

**Plaintiff's 2020 Performance Review**

39.     During February 2021, Plaintiff received his evaluation and a compilation of staff reviews ("360 review") reflecting his 2020 performance. **Ex. A, Pl. Dep. 44:1-13, Exhibit 8 (UKHA_000168-74); Doc. 48 at § 2.b.xiii.**

40.     It was common for a performance review to include a 360 review with input from multiple staff members with whom a manager works and interacts. **Ex. C, MacArthur Dep. 24:11-16.**

41.     Captain discussed the 360 review with Plaintiff via phone. **Ex. A, Pl. Dep. 69:16-70:9, Exhibit 8 (UKHA_000168-74); Doc. 48 at § 2.b.xiii.**

42.     Captain testified that she copied and pasted what staff reported about Plaintiff, including that he is "never welcoming and open to help" and "[h]e is very difficult to approach with problems." **Ex. B, Captain Dep. 71:10-72:25; Ex. A, Pl. Dep. Exhibit 8 (UKHA_000168-74); Doc. 48 at § 2.b.xiii.**

43.     Staff also said Plaintiff has an attitude that discourages communication between himself and staff and described the department as chaotic and frustrating. **Ex. A, Pl. Dep. 81:19-82:10.**

44.     Additionally, staff said Plaintiff "doesn't trust our decision making," "looks down at [staff's] intelligence," "leave[s] unannounced at the end of the day when we still have things going on that we could use help with," and "doesn't trust [staff's] abilities." **Ex. B, Captain Dep. 71:10-72:25; Ex. A, Pl. Dep. Exhibit 8 (UKHA_000168-74); Doc. 48 at § 2.b.xiii.**

45.     Overall, staff expressed that "[m]orale [in the Department] is usually never high." **Ex. B, Captain Dep. 71:10-72:25; Ex. A, Pl. Dep. Exhibit 8 (UKHA_000168-74); Doc. 48 at § 2.b.xiii.**

7

46.     Plaintiff admits that he signed the evaluation but testified that he was having computer problems and stated he did not see the portion containing the 360 review. **Ex. A, Pl. Dep. 72:19-73:3.**

47.     The next day, Plaintiff asked Captain more about the evaluation, and Captain told him he was mean to a staff member. **Ex. A, Pl. Dep. 78:8-21.**

48.     Plaintiff described himself as a direct communicator, though he admitted that the manner of communication is important. **Ex. A, Pl. Dep. 76:19-77:9.**

49.     Additionally, Plaintiff testified that staff were entitled to have their perceptions about him that were included in the 360 review, such as it being frustrating that Plaintiff did not seem to trust their abilities. **Ex. A, Pl. Dep. 75:20-76:10.**

50.     Plaintiff states that he went to Human Resources because he wanted it investigated that he was "charged with being mean" to staff. **Ex. A, Pl. Dep. 78:24-79:5.**

51.     Plaintiff agreed that it is a problem if people perceive that a supervisor is being mean to an employee that the supervisor should address. **Ex. A, Pl. Dep. 80:4-11.**

**Individuals Supposedly Out to Get Plaintiff**

52.     Rather than take accountability or acknowledge the concerns that staff raised during his 360 review, Plaintiff claims that MacArthur and Captain were "out to get" him. **Ex. A, Pl. Dep. 40:22-24, 41:14-43:3, 43:4-44:9, 226:18-21.**

53.     Plaintiff testified that Barbara MacArthur has been "out to get" him since at least 2017 when she hired Shane Julian as Clinical Director of Cardiology. **Ex. A, Pl. Dep. 40:22-24, 41:14-43:3, 224:21-225:5, 226:18-21.**

54.     At the same time MacArthur started being "out to get" Plaintiff, the Joint Commission performed the review of Plaintiff's department, finding problems with the protocols. **Ex. A, Pl. Dep. 226:18-227:6; Ex. C, MacArthur Dep. 17:22-21:5.**

8

55.    Plaintiff testified that Becky Captain, his direct supervisor at the time his employment ended, has been "out to get" him since early 2021. **Ex. A, Pl. Dep. 43:4-44:9; Ex. C, MacArthur Dep. 11:23-12:1.**

56.    Plaintiff believed Captain was "after [him]" and wanted to get rid of "older managers," a term he allegedly heard through the grapevine, not directly. **Ex. A, Pl. Dep. 194:12-195:8, 306:19.**

57.    However, none of the individuals that Plaintiff identified as the "older managers" whom Captain supposedly wanted to get rid of were ever terminated. **Ex. A, Pl. Dep. 195:5-201:14.**

**One of Plaintiff's Direct Reports Complains about Plaintiff's Treatment**

58.    Reports of Plaintiff's communication and issues with staff continued to escalate: in June 2022, Denise Hashman, currently age 63, who reported to Plaintiff and was out on leave, called Jane Gonzalez, Employee Relations Consultant. **Ex. D, Deposition of Jane Gonzalez (Gonzalez Dep.) 23:4-16, 30:23-31:4; Ex. A, Pl. Dep. Exhibit 11 (UKHA_000541); Doc. 48 at §§ 2.a.vi, 2.b.xvi; Ex. H, Wilkinson Dec. at ¶ 9-10.**

59.    Hashman informed Gonzalez that Plaintiff told her she needed to get her medications checked, and Hashman's doctor placed her on leave to decide if she should be working. **Ex. D, Gonzalez Dep. 23:18-24:6, Exhibit 32 (UKHA_000541); Doc. 48 at § 2.b.xvi.**

60.    Hashman expressed that Plaintiff held her to a higher standard and informed Gonzalez that she had to see a psychiatrist because of the way Plaintiff treated her. **Ex. D, Gonzalez Dep. 73:3-11, Exhibit 32 (UKHA_000541); Ex. B, Captain Dep. 64:8-13; Doc. 48 at § 2.b.xvi.**

61.    Plaintiff made Hashman uncomfortable and was bullying her. **Ex. D, Gonzalez Dep. 73:3-11, Exhibit 32 (UKHA_000541); Ex. B, Captain Dep. 64:8-13; Doc. 48 at § 2.b.xvi.**

62. Plaintiff admitted that "nobody should make anybody have to go to a psychiatrist." **Ex. A, Pl. Dep. 119:20-22.**

63. Because Hashman was concerned about Plaintiff retaliating against her for going to Employee Relations, Hashman asked Gonzalez not to speak to Plaintiff regarding her complaint. **Ex. D, Gonzalez Dep. 27:14-18; Ex. B, Captain Dep. 20:16-22.**

64. Hashman expressed that it would make it more difficult for her at work if Gonzalez reached out to Plaintiff. **Ex. D, Gonzalez Dep. 27:14-18; Ex. B, Captain Dep. 20:16-22.**

65. Gonzalez agreed to not reach out to Plaintiff, per Hashman's request. **Ex. D, Gonzalez Dep. 27:14-18; Ex. B, Captain Dep. 20:16-22.**

66. Instead, Gonzalez offered to reach out to Hashman when she returned to work from medical leave. **Ex. D, Gonzalez Dep. 27:19-21.**

67. When Hashman returned to work, Captain met with her in August 2022. **Ex. B, Captain Dep. 65:8-25; Ex. A, Pl. Dep. Exhibit 12 (UKHA_000047-49); Doc. 48 at § 2.b.xvii.**

68. Captain knew Hashman "feared" Plaintiff. **Ex. B, Captain Dep. 62:23-63:7.**

69. During her meeting with Captain, Hashman was tearful with a runny nose for the entire half an hour she was in Captain's office. **Ex. B, Captain Dep. 65:8-25; Ex. A, Pl. Dep. Exhibit 12 (UKHA_000047-49); Doc. 48 at § 2.b.xvii.**

70. During this meeting, Hashman described Plaintiff as condescending toward her and stated she was diagnosed with pseudodementia caused by stress and anxiety from working with Plaintiff. **Ex. B, Captain Dep. 65:8-25; Ex. A, Pl. Dep. Exhibit 12 (UKHA_000047-49); Doc. 48 at § 2.b.xvii.**

71. Hashman informed Captain that Plaintiff relocated her from Overland Park to the main hospital. **Ex. A, Pl. Dep. 26:13-27:5; Ex. A, Pl. Dep. Exhibit 12 (UKHA_000047-49); Doc. 48 at § 2.b.xvii.**

72. In fact, Hashman had not asked to be transferred to the main campus; Plaintiff unilaterally made the decision. **Ex. A, Pl. Dep. 136:2-8.**

73. Hashman also stated that she had to go to the Emergency Department for high blood pressure due to work-related stress. **Ex. B, Captain Dep. 65:8-25; Ex. A, Pl. Dep. Exhibit 12 (UKHA_000047-49); Doc. 48 at § 2.b.xvii.**

74. During his deposition, Plaintiff attributed Hashman feeling uncomfortable around him as her having trouble with men. **Ex. A, Pl. Dep. 116:9-13.**

75. Later, in December 2022, Gonzalez again spoke with Hashman. **Ex. D, Gonzalez Dep. 75:9-14, Exhibit 31 (UKHA_000540); Ex. A, Pl. Dep. Exhibit 19 (UKHA_000068); Doc. 48 at § 2.b.xxiii.**

76. Hashman described Plaintiff's management of the department as chaos, and she confirmed that she had seen Plaintiff retaliate against others. **Ex. D, Gonzalez Dep. 75:15-24, Exhibit 31 (UKHA_000540); Ex. A, Pl. Dep. Exhibit 19 (UKHA_000068); Doc. 48 at § 2.b.xxiii.**

77. Hashman also relayed to Gonzalez that she had developed post-traumatic stress disorder (or "PTSD") as a result of working for Plaintiff. **Ex. D, Gonzalez Dep. 75:15-24, Exhibit 31 (UKHA_000540); Ex. A, Pl. Dep. Exhibit 19 (UKHA_000068); Doc. 48 at § 2.b.xxiii.**

78. Plaintiff admitted that it would be unacceptable for a supervisor to cause a subordinate to develop PTSD. **Ex. A, Pl. Dep. 50:10-13.**

**Employee Relations Investigation**

79. In addition to Denise Hashman, other employees expressed concerns about Plaintiff, and the nuclear department was facing significant turnover of nuclear technologists. **Ex. D, Gonzalez Dep. 31:8-15; Ex. C, MacArthur Dep. 26:10-11; Ex. E, Deposition of Chris Ruder (Ruder Dep.) 41:11-15.**

80. In the fall of 2022, multiple employees raised concerns about the department to Captain. **Ex. D, Gonzalez Dep. 31:17-32:9; Ex. B, Captain Dep. 22:11-23:4:17.**

81. Captain asked Jane Gonzalez, who supported the Nuclear Department as its Employee Relations Consultant, for help investigating the concerns. **Ex. D, Gonzalez Dep. 31:17-32:9; Ex. B, Captain Dep. 22:11-23:4:17.**

82. Captain individually met with employees who asked to speak with her. **Ex. B, Captain Dep. 22:1-10.**

83. Employees raised several concerns with Captain that she then passed along to Human Resources, which Plaintiff attributed to a "mob mentality": workflows and processes were described as tedious; staff often felt berated or yelled at by Plaintiff; and Plaintiff lacked self-awareness. **Ex. B, Captain Dep. 26:14-27:22; Ex. A, Pl. Dep. 39:18-22, Exhibit 12 (UKHA_000047-49), Exhibit 13 (UKHA_000055), Exhibit 14 (UKHA_000014-17); Doc. 48 at §§ 2.b.xvii, xviii, xix, xxxii, xxxiii.**

84. Everything Captain gave to Human Resources "was presented from the staff coming to [Captain]" and were not based on Captain's own perceptions. **Ex. B, Captain Dep. 27:23-28:6.**

85. Captain spoke with Plaintiff's staff members in the nuclear department such as Denise Hashman, Riley Wenzel, Kellee George, and Austin Kirkwood. **Ex. B, Captain Dep.**

12

**22:11-23:14, 66:1-68:16; Ex. A, Pl. Dep. Exhibit 13 (UKHA_000055), Exhibit 14 (UKHA_000014-17), Exhibit 16 (UKHA_000063); Doc. 48 at § 2.b.xviii.**

86.     Jane Gonzalez spoke with many of these individuals as well, in order to conduct due diligence and provide information for management to make a decision regarding Plaintiff's employment. **Ex. D, Gonzalez Dep. 33:6-14, 40:16-23; Ex. C, MacArthur Dep. 25:9-14.**

87.     In December 2022, Gonzalez conducted interviews with seven employees from Plaintiff's department. **Ex. D, Gonzalez Dep. 85:20-86:3, Exhibit 43 (UKHA_000056-58); Ex. A, Pl. Dep. Exhibit 21 (UKHA_000056-58); Doc. 48 at § 2.b.xxv.**

88.     Gonzalez's notes summarized the group interviews, which corroborated that Plaintiff had communication issues, problems with disrespectful behavior, and issues managing the department. **Ex. D, Gonzalez Dep. 78:18-80:3, 85:20-86:3, Exhibit 43 (UKHA_000056-58); Ex. A, Pl. Dep. Exhibit 21 (UKHA_000056-58); Doc. 48 at § 2.b.xxv.**

89.     For example, staff made comments during the interviews such as: Plaintiff's "communication skills [are] awful"; Plaintiff "treat[s] others horribly" and is "unprofessional"; Plaintiff can be "condescending," manipulative," and "disrespectful"; Plaintiff "treats [Denise Hashman] differently and with disrespect"; Plaintiff is "constantly changing the schedule"; and Plaintiff's management causes "chaos" and frustration due to "poor processes." **Ex. D, Gonzalez Dep. 85:20-86:3, Exhibit 43 (UKHA_000056-58); Ex. A, Pl. Dep. Exhibit 21 (UKHA_000056-58); Doc. 48 at § 2.b.xxv.**

90.     Staff also mentioned that Plaintiff told them that Captain was trying to "squeeze" him out. **Ex. D, Gonzalez Dep. 85:20-86:3, Exhibit 43 (UKHA_000056-58); Ex. A, Pl. Dep. Exhibit 21 (UKHA_000056-58); Doc. 48 at § 2.b.xxv.**

91.     Plaintiff agreed that his employees' comments, if true, would warrant an employee being placed on administrative leave. **Ex. A, Pl. Dep. 189:24-190:23, Exhibit 21 (UKHA_000056-58); Doc. 48 at § 2.b.xxv.**

92.     On December 13, 2022, Gonzalez spoke with Austin Kirkwood, former Nuclear Technologist. **Ex. D, Gonzalez Dep. 81:10-82:16; Ex. A, Pl. Dep. Exhibit 15 (UKHA_000063-65); Doc. 48 at § 2.b.xx.**

93.     Kirkwood told Gonzalez that Plaintiff's management of the department and schedules was chaotic, and Plaintiff is condescending. **Ex. A, Pl. Dep. Exhibit 15 (UKHA_000063-65); Doc. 48 at § 2.b.xx.**

94.     Among other things, Kirkwood said the nuclear department "is the most stressful[,] chaotic environment." **Ex. A, Pl. Dep. Exhibit 15 (UKHA_000063-65); Doc. 48 at § 2.b.xx.**

95.     On December 15, 2022, Gonzalez spoke with Derek Blaakman, Nuclear Technologist. **Ex. D, Gonzalez Dep. 83:9-84:25; Ex. A, Pl. Dep. Exhibit 17 (UKHA_000018-21); Doc. 48 at § 2.b.xxi.**

96.     During his meeting with Gonzalez, Blaakman said Plaintiff is very paranoid, complained to him about Captain, and berated him in the past. **Ex. A, Pl. Dep. Exhibit 17 (UKHA_000018-21); Doc. 48 at § 2.b.xxi; Ex. D, Gonzalez Dep. 77:11-18.**

97.     It is a violation of UKHA's conduct policy for a supervisor to berate their employees. **Ex. D, Gonzalez Dep. 77:15-24.**

98.     Blaakman also told Gonzalez that employees do not feel comfortable going to Human Resources about Plaintiff because they fear retaliation. **Ex. A, Pl. Dep. Exhibit 17 (UKHA_000018-21); Doc. 48 at § 2.b.xxi.**

14

99.    Next, Gonzalez individually met with Sam Ward, Alexandra Wise, and Denise Hashman, all of whom reported to Plaintiff, from December 19 to 20, 2022. **Ex. D, Gonzalez Dep. 78:1-14, 73:12-21, 72:21-73:6, Exhibit 42 (UKHA_000544-45), Exhibit 33 (UKHA_000542), Exhibit 32 (UKHA_000541); Ex. A, Pl. Dep. Exhibit 18 (UKHA_000066-67), Exhibit 19 (UKHA_000068), Exhibit 20 (UKHA_000542); Doc. 48 at §§ 2.b.xxii-xxiv.**

100.    Ward reported to Gonzalez about Plaintiff's poor communication and scheduling issues; Wise said Plaintiff treated her differently; and Hashman said Plaintiff held her to a higher standard and caused chaos in the team. **Ex. D, Gonzalez Dep. 78:1-14, 73:12-21, 72:21-73:6, Exhibit 42 (UKHA_000544-45), Exhibit 33 (UKHA_000542), Exhibit 32 (UKHA_000541); Ex. A, Pl. Dep., Exhibit 18 (UKHA_000066-67), Exhibit 19 (UKHA_000068), Exhibit 20 (UKHA_000542); Doc. 48 at §§ 2.b.xxii-xxiv.**

101.    On January 3, 2023, Gonzalez spoke with Kelsey Allen-Scruggs, Nurse Manager. **Ex. D, Gonzalez Dep. 75:25-76:14, Exhibit 40 (UKHA_000566-67); Ex. A, Pl. Dep. Exhibit 22 (UKHA_ 000069-70); Doc. 48 at § 2.b.xxvi.**

102.    Allen-Scruggs communicated that Plaintiff had poor communication and that Plaintiff believed equipment issues could possibly be a manufacturer conspiracy. **Ex. D, Gonzalez Dep. 75:25-76:14, 86:4-13, Exhibit 40 (UKHA_000566-67); Ex. A, Pl. Dep. Exhibit 22 (UKHA_ 000069-70); Doc. 48 at § 2.b.xxvi.**

103.    On or about January 5, 2023, Gonzalez spoke with Kellee George, a former Nuclear Technologist. **Ex. D, Gonzalez Dep. 57:21-58:17, Exhibit 39 (UKHA_000568-69); Doc. 48 at § 2.b.xxvii.**

104.    George stated that Plaintiff micromanaged people in his department and did not treat people the same. **Ex. D, Gonzalez Dep. 74:2-12, Exhibit 39 (UKHA_000568-69); Doc. 48 at § 2.b.xxvii.**

**Plaintiff Mishandles a Nuclear Camera Issue**

105.    In August 2022, Becky Captain and Barbara MacArthur learned that a nuclear camera was not operating properly and discovered that Plaintiff was not following internal standards regarding a nuclear camera. **Ex. C, MacArthur Dep. 35:9-37:11.**

106.    The camera, which was delivered in January 2022, was not installed until April 2022. **Ex. A, Pl. Dep. 173:8-23, Exhibit 9 (UKHA_000522-28); Doc. 48 at § 2.b.xiv.**

107.    Images from the camera were coming out blurry and unclear. **Ex. C, MacArthur Dep. 35:9-18.**

108.    When MacArthur investigated why the images had issues, she learned, by way of Captain, that Feldkamp had known about the problems with the camera and had been tinkering with it for eight months. **Ex. C, MacArthur Dep. 35:19-25.**

109.    Plaintiff took it upon himself to tweak the camera settings without consulting internal resources to attend to the piece of highly technical equipment. **Ex. C, MacArthur Dep. 35:9-37:11; Ex. A, Pl. Dep. 273:1-274:7, Exhibit 9 (UKHA_000522-28); Doc. 48 at § 2.b.xiv.**

110.    Plaintiff failed to follow the requisite standards for tracking the equipment when it entered the system, did not properly document paperwork and warranties, and failed to utilize internal resources to attend to the equipment. **Ex. C, MacArthur Dep. 36:13-37:11.**

111.    Ultimately, Plaintiff failed to escalate the issue to the appropriate systems within UKHA for equipment providing patient care. **Ex. C, MacArthur Dep. 38:5-9.**

112.    This operational misjudgment regarding the nuclear camera was one of several reasons Plaintiff was placed on administrative leave and ultimately terminated. **Ex. C, MacArthur Dep. 35:9-37:11; Ex. A, Pl. Dep. Exhibit 29 (UKHA_000099-103); Doc. 48 at § 2.b.xxxvii.**

**Other Employees Report Concerns with Treadmills**

113.    Throughout the Cardiology Department, treadmills are used for cardiac stress testing, which elevates the patient's heart rate to identify abnormalities. **Ex. A, Pl. Dep. 133:9-11; Ex. B, Captain Dep. 42:15-20; Ex. G, Deposition of Holly Grier (Grier Dep.) 17:7-18:24.**

114.    In 2022, UKHA became aware that some treadmills were reportedly stopping during patient testing. **Ex. A, Pl. Dep. 240:5-241:6, Exhibit 4 (UKHA_000653-79); Doc. 48 at § 2.b.i.**

115.    On July 7, 2022, Jennifer Kindhart, Cardiovascular Sonographer, placed the first work order regarding an issue with a new GE treadmill. **Ex. A, Pl. Dep. 240:5-241:6, Exhibit 4 (UKHA_000653-79); Doc. 48 at § 2.b.i; Ex. H, Wilkinson Dec. at ¶ 8.**

116.    In the work order, Kindhart indicated that when staff pressed the comment button, the treadmill would stop. **Ex. A, Pl. Dep. 240:5-241:6, Exhibit 4 (UKHA_000653-79); Doc. 48 at § 2.b.i.**

117.    In the beginning, it was not clear what was happening with the treadmills, but Holly Grier, Cardiovascular Ultrasound Manager, heard from her staff that treadmills were stopping while stress testing patients. **Ex. G, Grier Dep. 12:1-3, 52:8-20.**

118.    On October 24, 2022, Grier emailed Becky Captain about a treadmill that stopped mid-procedure, for which she filed a work request with the biomedical engineering department ("biomed"). **Ex. A, Pl. Dep. 247:7-248:7, Exhibit 5 (UKHA_000507); Doc. 48 at § 2.b.ii; Ex. C, MacArthur Dep. 27:15-16; Ex. G, Grier Dep., Exhibit 3 (UKHA_000053-54).**

119.    Grier was not disciplined, demoted, or terminated for submitting a work request or sending the email on October 24, 2022. **Ex. G, Grier Dep. 73:23-75:14, Exhibit 3 (UKHA_000053-54); Ex. A, Pl. Dep. Exhibit 5 (UKHA_000507); Doc. 48 at § 2.b.ii.**

120.    In October 2022, Trang Luu, Clinical Risk Manager, spoke with Grier and Kelsey Allen-Scruggs, Nurse Manager, to gather details about the treadmills that were being reported. **Ex. F, Trang Luu Deposition (Luu Dep.) 8:5-12.**

121.    Grier and Allen-Scruggs connected with the treadmill manufacturer, GE, to escalate the issue and find a solution in conjunction with Luu in risk management and hospital leadership. **Ex. F, Luu Dep. 12:18-14:2.**

122.    Chris Ruder, Chief Operating Officer, was also made aware of the situation by Becky Captain and Barbara MacArthur, by way of Holly Grier. **Ex. E, Ruder Dep. 7:21-23, 47:7-15.**

123.    Ruder is not the chief administrative officer of the organization. **Ex. E, Ruder Dep. 12:25-13:7.**

124.    Plaintiff was not the first to raise a concern regarding the treadmills to Ruder or others. **Ex. E, Ruder Dep. 14:2-19:12; Ex. A, Pl. Dep. 248:3-5, Exhibit 5 (UKHA_000507, 272-274, 271, 470-71, 253-54, 255-60, 261-69); Doc. 48 at §§ 2.b.ii-viii; Ex. F, Luu Dep. 8:5-12.**

125.    Plaintiff never filled out or completed a work order for treadmills. **Ex. A, Pl. Dep. 243:10-14, Exhibit 4 (UKHA_000653-79); Doc. 48 at § 2.b.i.**

126.    In fact, Plaintiff had never even seen a report like Kindhart's until his deposition. **Ex. A, Pl. Dep. 243:10-14, Exhibit 4 (UKHA_000653-79); Doc. 48 at § 2.b.i.**

127.    Additionally, Plaintiff admitted that Grier raised the issue about the treadmills before he did. **Ex. A, Pl. Dep. 248:3-5, Exhibit 5 (UKHA_000507, 272-274, 271, 470-71, 253-54, 255-60, 261-69); Doc. 48 at §§ 2.b.ii-viii; Ex. B, Captain Dep. 44:10-16.**

128.    Luu testified that she did not remember Plaintiff at initial meetings, nor did she speak with him one-on-one. **Ex. F, Luu Dep. 14:3-15:6.**

129.    It was not until November 2022, four months after other employees had submitted work orders regarding the treadmills, that Plaintiff was looped into communications regarding the treadmills, including group email threads and video conference huddle meetings with leadership. **Ex. A, Pl. Dep. 249:11-21, 131:25-134:11; Ex. B, Captain Dep. 44:25-46:10.**

130.    On November 29, 2022, Grier and Plaintiff emailed Captain that they believed there was a patient safety risk due to the unknown aspects of the issue with the treadmill. **Ex. A, Pl. Dep. 250:12-25, Exhibit 5 (UKHA_000470-71); Doc. 48 at § 2.b.v.**

131.    Captain, despite being out of the office, responded in agreement. **Ex. A, Pl. Dep. 251:1-6, Exhibit 5 (UKHA_000470-71); Ex. B, Captain Dep. 55:24-56:4; Doc. 48 at § 2.b.v.**

132.    GE informed UKHA that the reported treadmill events involved the treadmills slowing down and not abruptly stopping. **Ex. G, Grier Dep. 52:21-25.**

133.    UKHA continued to investigate treadmill events with the GE team to ensure patients could receive the care they needed without putting them at risk of harm. **Ex. G, Grier Dep. 60:6, 19-21; Ex. B, Captain Dep. 56:9-14; Ex. E, Ruder Dep. 51:17-52:8.**

134.    Plaintiff's November 29, 2022, email was the only instance of Plaintiff directly emailing Captain about a perceived safety issue regarding the treadmills; Captain did not hesitate to prioritize patient safety based on these concerns. **Ex. B, Captain Dep. 55:19-56:19.**

135.    Plaintiff's involvement during meetings was also limited—Luu testified that she did not recall talking to Plaintiff "a lot at all" and did not remember Plaintiff speaking up during meetings. **Ex. F, Luu Dep. 15:7-11.**

136.    Other UKHA employees who were included in the treadmill discussions and email correspondence are still employed with UKHA, and Plaintiff testified he is not aware of their employment being terminated. **Ex. A, Pl. Dep. 254:22-255:2, Exhibit 5 (UKHA_000255-60); Doc. 48 at § 2.b.vii; Ex. G, Grier Dep. 57:9-22, 73:10-22, Exhibit 4 (UKHA_000059).**

137.    For instance, Kelsey Allen-Scruggs, Nurse Manager; Trang Luu, Clinical Risk Manager; information technology employees such as Ron Galloway and Terry Garner; and biomed employees such as Mike Kirby and Chris Bell are currently employed at UKHA. **Ex. A, Pl. Dep. 254:22-255:2, Exhibit 5 (UKHA_000255-60); Ex. G, Grier Dep. 57:9-22, 73:10-22, Exhibit 4 (UKHA_000059).**

138.    Grier, who is 46 years old, also still works at UKHA and reports directly to Becky Captain. **Ex. G, Grier Dep. 73:15-16; 13:23-14:1; Ex. A, Pl. Dep. 219:11-22.**

139.    Plaintiff never accused UKHA of violating the standard of care. **Ex. A, Pl. Dep. 6:19-21.**

140.    Plaintiff never reported UKHA for violating the standard of care. **Ex. A, Pl. Dep. 6:19-21.**

141.    The GE and UKHA teams continue to work together to resolve software issues, including the software issue that occurred in 2022 causing the slowdowns. **Ex. F, Luu Dep. 18:3-11.**

**<u>Lead up to Termination of Plaintiff's Employment</u>**

142.    On January 5, 2023, Plaintiff met with Cherie Smith, Employee Relations Manager, and Jane Gonzalez. **Ex. A, Pl. Dep. 19:3-12; Ex. D, Gonzalez Dep. 35:24-36:25.**

143.    The purpose of the meeting was to share the concerns that were documented during the Employee Relations investigation and provide Plaintiff the opportunity to provide his input about the situations at issue. **Ex. D, Gonzalez Dep. 36:18-21.**

144.    During this meeting, Plaintiff was asked about the reported communication issues and chaos in the department. **Ex. A, Pl. Dep. 30:17-31:2, Exhibit 24 (UKHA_000073-76); Doc. 48 at § 2.b.xxviii.**

145.    Several issues that were addressed in Plaintiff's 2020 evaluation and 360 review were again discussed with him when he was put on administrative leave—communication, approachability, and scheduling. **Ex. D, Gonzalez Dep. 34:8-14.**

146.    Plaintiff also admitted he asked staff, such as Derek Blaakman, about their conversations with Captain about him. **Ex. A, Pl. Dep. Exhibit 24 (UKHA_000073-76); Doc. 48 at § 2.b.xxviii.**

147.    Gonzalez and Smith made the decision to place Plaintiff on administrative leave, and Plaintiff was ultimately placed on administrative leave starting on January 6, 2023. **Ex. A, Pl. Dep. 36:24-37:2; Ex. D, Gonzalez Dep. 39:1-15, 39:20-23.**

148.    During Plaintiff's administrative leave, Plaintiff told Dr. Thomas Rosamond, Director of Nuclear Cardiology, that Derek Blaakman was working as a nuclear technologist without a license. **Ex. C, MacArthur Dep. 46:9-18.**

149.    Plaintiff said that he had just found out that Blaakman had been working without a license. **Ex. A, Pl. Dep. 284:20-285:25.**

150.    In fact, Blaakman told Plaintiff he got a temporary license when he first started employment, a fact to which Plaintiff admitted in his deposition. **Ex. A, Pl. Dep. 284:20-285:25.**

151.    Plaintiff, as Blaakman's supervisor, had a responsibility to be notified about licensure and help his staff with those licenses. **Ex. C, MacArthur Dep. 48:2-9.**

152.    Instead of helping to resolve the potential issue of a staff member working without a license, Plaintiff texted Chris Ruder and Dr. Rosamond that Blaakman "fabricated stories about [him]." **Ex. A, Pl. Dep. Exhibit 24 (UKHA_000080); Doc. 48 at § 2.b.xxxi; Ex. E, Ruder Dep. 25:20-26:5.**

153.    Ruder sent the text to Gonzalez so Blaakman's licensure could be verified. **Ex. E, Ruder Dep. 27:1-3.**

154.    Blaakman, contrary to the allegation in Plaintiff's text message, was indeed licensed with an emergency license that had been extended. **Ex. C, MacArthur Dep. 47:5-48:22.**

**Plaintiff's Termination**

155.    While Plaintiff was out on administrative leave, decisionmakers met multiple times to discuss Plaintiff's employment. **Ex. C, MacArthur Dep. 41:19-42:11, 44:9-11.**

156.    Due to the escalating performance issues during the last five years of Plaintiff's employment, including lack of regulatory readiness with the Joint Commission; mishandling of a nuclear camera; and employee concerns and turnover due to Plaintiff's poor communication and management-related chaos, it became "imperative that [Plaintiff] no longer be in the organization." **Ex. C, MacArthur Dep. 41:19-42:11, 44:9-11.**

157.    Consideration was provided to give Plaintiff an opportunity to improve or hold another role within UKHA, but it was decided that his lack of ownership, truthfulness, and communication was not conducive to continued employment. **Ex. C, MacArthur Dep. 44:2-18; Ex. E, Ruder Dep. 41:16-43:6.**

158.    Plaintiff's age did not play any role in the decision to terminate his employment, and the group of decisionmakers was "mature." **Ex. C, MacArthur Dep. 55:7-14.**

159.    Becky Captain was not involved in the final decision-making meeting. **Ex. B, Captain Dep. 33:13-34:3.**

160.    Plaintiff's employment ended on February 6, 2023, in a call led by MacArthur. **Ex. A, Pl. Dep. 10:24-12:1.**

161.    MacArthur was the ultimate decision-maker in deciding to terminate Plaintiff's employment. **Ex. C, MacArthur Dep. 13:22-24.**

162.    Fifty-three-year-old Mitch Bronson, date of birth March 1, 1972, was later hired as Plaintiff's replacement. **Ex. H, Wilkinson Dec. at ¶ 11-12.**

## III.    ARGUMENT AND AUTHORITIES

### A.    Standard of Review

Summary judgment plays an important role in the adjudication of cases—it is not a "disfavored procedural shortcut," but is rather an "important procedure 'designed to secure the just, speedy and inexpensive determination of every action.'" *Wingerd v. Kabooworks Servs., LLC*, Case No, 18-CV-2024-JAR-KGG, 2019 WL 1171700, at *1 (D. Kan. Mar. 13, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). Summary judgment is appropriate where the "moving party demonstrates . . . 'there is no genuine dispute as to any material fact' and that it is 'entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). A material fact is one which is "essential to the proper disposition of the claim." *Id.* (quoting *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001)). No "genuine" dispute exists unless sufficient evidence exists on "each side so that a rational trier of fact could resolve the issue either way." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)) (emphasis added).

A "genuine issue" of material fact cannot be made with "generic" or "conclusory" testimony. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 752 (10th Cir. 2000). Nor is a plaintiff's subjective evaluation or his conjecture adequate to forestall summary judgment. *See id.* (citing *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 768, 772 (10th Cir. 1988)); *see also Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1207 (10th Cir. 2004) (conclusory allegations, conjecture, or mere allegations of impartial treatment are insufficient to show pretext in claims of retaliation); *Wright v. Wyandotte Cnty. Sheriff's Dept.*, 963 F. Supp. 1029, 1037 (D. Kan. 1997) (citation omitted).

UKHA is entitled to summary judgment on Plaintiff's claims of age discrimination and wrongful termination under K.S.A. § 65-4928 because Plaintiff, even when considering the facts in a light most favorable to his case, fails to present sufficient evidence to support each and every element in each of his claims.

**B.      Plaintiff has not satisfied and cannot satisfy the proof required for his ADEA discrimination claim to proceed.**

To prevail on his claim of age discrimination and hold UKHA liable, Plaintiff must prove that, but for his age, UKHA would not have made the decision to terminate his employment. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277-78 (10th Cir. 2010) (citing *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1170 (10th Cir. 1985)). In short, Plaintiff's age must have "made a difference." *Id.*

Plaintiff must prove his claims by either direct or circumstantial evidence. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Here, Plaintiff cannot proffer any

facts that rise to the standard of direct evidence, and accordingly, must prove his claim of age discrimination using circumstantial evidence.

Because Plaintiff has no direct evidence of any of his claims, the *McDonnell Douglas* burden-shifting analysis applies. *Jones*, 617 F.3d at 1278-79. Plaintiff "bears the initial burden of setting forth a case of prima facie discrimination." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998). Only if plaintiff meets this burden does the burden then shift to the employer to give a legitimate, non-discriminatory or non-retaliatory reason for its employment decision. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 2007). Once the employer presents evidence of a non-discriminatory reason for its actions, plaintiff then must prove that the proffered reasons are pretext for unlawful discrimination. *Id.* Plaintiff thus must demonstrate pretext to get "over the hurdle of summary judgment." *Id.* at 1323.

## C.    Plaintiff's ADEA discrimination claim fails at the *prima facie* stage.

Plaintiff cannot establish all four elements necessary for a *prima facie* case of age discrimination. Because he cannot establish all four elements, Plaintiff's claim fails.

In ADEA cases based on termination, the burden of proving a *prima facie* case requires that Plaintiff establish he (1) was over the age of 40; (2) performed satisfactory work; (3) was terminated from employment; and (4) was replaced by a younger person. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (citation omitted); *see also Janzen v. Portfolio Recovery Assocs., L.L.C.*, Case No. 21-cv-1107-EFM, 2022 WL 4182314, at *6 (D. Kan. Sept. 13, 2022).

It is undisputed that Plaintiff was over the age of forty when he was terminated from employment at UKHA. **(SOF 5).**  His replacement, Mitch Bronson, though younger than Plaintiff, is 53 years old. **(SOF 162).** Due to Plaintiff's performance issues, however, he cannot demonstrate that he was performing satisfactory work. **(SOF 14-38, 39-51, 58-78, 79-104, 105-112, 148-154,**

**156).** Thus, Plaintiff cannot satisfy the second element of a *prima facie* case of age discrimination. *See Lewis v. Twenty-First Century Bean Processing*, 638 Fed. App'x 701, 703 (10th Cir. 2016) (affirming the district court's granting of summary judgment because plaintiff failed to provide evidence that his work was satisfactory).

> ### 1.   The record demonstrates that by the end of his employment, Plaintiff was not performing his position satisfactorily.

Plaintiff's conduct ultimately demonstrated that he was not performing satisfactorily as the Nuclear Cardiology Director. As Director, Plaintiff's job responsibilities included supervising employees, such as nuclear technologists; managing schedules and staffing; ensuring adherence to regulatory compliance standards; and tracking credentialing requirements. **(SOF 6-7).** In the last five years of Plaintiff's employment, it became clear that he was unable to satisfactorily perform his job responsibilities. **(SOF 14-38, 39-51, 58-78, 79-104, 105-112, 148-154, 156).** For instance, Plaintiff repeatedly demonstrated a failure to adhere to regulatory compliance standards. In 2017, a Joint Commission Official Certification Report determined that Plaintiff's department had unacceptable protocols, putting patients at risk. **(SOF 14-17).** Plaintiff, however, refused to accept responsibility for these serious deficiencies. **(SOF 18-20).** Plaintiff also failed to adhere to internal standards for a malfunctioning nuclear camera; instead, he took it upon himself to "tweak" a highly technical nuclear camera for months without looping in his supervisor or using internal resources. **(SOF 105-112).**

Plaintiff also failed to satisfactorily track the credentialing requirements of his direct reports. For example, Plaintiff was aware that a nuclear technologist had a temporary license when he was hired. **(SOF 150).** As a supervisor, Plaintiff was responsible for receiving notifications about licensure and helping staff maintain their licenses. **(SOF 151).** However, rather than track the necessary requirements, Plaintiff told the Director of Nuclear Cardiology that the technologist

was working without a license, failing to properly verify that the emergency license had not expired or help his employee. **(SOF 148-154).**

Plaintiff's performance as a supervisor was not only unsatisfactory, but it also caused significant turnover in technologists. **(SOF 79, 156).** Multiple employees reported concerns about Plaintiff's poor communication and supervision to both Human Resources and Plaintiff's direct supervisor, Becky Captain. **(SOF 21-38, 39-51, 58-61, 79-83).** Because of the volume and significance of the issues raised in these reports, Employee Relations conducted a fact-finding investigation. **(SOF 75-77, 79-104).** During several interviews with various members of Plaintiff's staff, Plaintiff was described as lacking self-awareness, condescending, and berating. **(SOF 83, 89).** It was also reported that Plaintiff had tedious workflows and processes throughout the department, constantly changed the schedule, and caused chaos in the department. **(SOF 83, 89).** Plaintiff caused one employee such distress that she had to see a psychiatrist and suffered PTSD from working with him. **(SOF 77-78).** On another occasion, that same employee had to be admitted to the emergency department due to high blood pressure from workplace stress. **(SOF 73).** Plaintiff admitted that "nobody should make anybody have to go to a psychiatrist." **(SOF 62).** Plaintiff's failure to adhere to UKHA's conduct policy and manage his department effectively demonstrated that he could not and did not perform his position in a satisfactory manner.

Accordingly, Plaintiff was not performing satisfactorily because he did not meet UKHA's legitimate expectations. *Kelly-Koffi v. Wesley Med. Ctr.*, 241 F. Supp. 2d 1289, 1294 (D. Kan. 2003) (finding that plaintiff failed to establish prima facie case of discrimination where she failed to show she was meeting her employer's legitimate expectation). Instead, Plaintiff had several documented performance issues, indicating poor quality of work that did not merit continued employment. *See Acosta v. Allegion, PLC*, No. 19-cv-02420-TC, 2022 WL 764432, at *5 (D. Kan.

Mar. 11, 2022) (determining that plaintiff had uncontroverted performance failures that indicated she was not qualified for her role). Because Plaintiff cannot satisfy the second essential element of a *prima facie* case, his ADEA claim fails.

> **D.    Plaintiff's employment was terminated for legitimate, non-discriminatory reasons.**

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of discrimination, which he cannot, UKHA can comfortably meet its burden of identifying a legitimate, non-discriminatory reason for Plaintiff's termination. This burden is "exceedingly light," and UKHA must articulate a non-prohibited reason for Plaintiff's termination that is reasonably specific and clear. *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022); *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020).

UKHA terminated Plaintiff's employment because it became "imperative" that Plaintiff no longer be a part of the organization due to his performance issues. **(SOF 156).** In Plaintiff's written evaluation and leading up to his termination, employees reported to Plaintiff's supervisor and Human Resources that Plaintiff created a stressful, chaotic environment. **(SOF 39-51, 58-78, 79-104).** According to Plaintiff's subordinates, Plaintiff yelled at them, was disrespectful and manipulative, and was unprofessional. **(SOF 83, 89).** Multiple nuclear technologists left employment because of Plaintiff's leadership, or lack thereof. **(SOF 79, 156).** This alone was enough to justify terminating Plaintiff's employment. Plaintiff also lacked other technical management skills that were necessary for success in his role, however. For example, Plaintiff created scheduling issues among staff, micromanaged people and processes, and failed to follow internal operating procedures regarding nuclear equipment and regulatory protocols. **(SOF 14-17, 83, 89, 93, 100, 104, 105-112).**

After an extensive fact-finding investigation and meetings with various individuals working for Plaintiff, Human Resources met with Plaintiff prior to placing him on administrative leave. **(SOF 142-143).** Plaintiff was again informed about the communication and management issues that had plagued his department over the last couple of years. **(SOF 142-145).** Plaintiff, unreceptive to feedback or coaching, believed that his supervisors were "out to get" him, and blamed employees raising concerns about him on a "mob mentality." **(SOF 52-47, 83).** Human Resources decided to place Plaintiff on administrative leave. **(SOF 91, 112, 142-147).**

During his leave, leadership discussed Plaintiff's employment and future with UKHA **(SOF 155-158).** Ultimately, it was decided that Plaintiff's lack of ownership, truthfulness, and communication were not conducive to further employment, demotion, or performance improvement plan. **(SOF 156-157)**; *see Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005) ("Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination.").

As the above shows, UKHA clearly has met its burden of articulating the legitimate, non-discriminatory reason for Plaintiff's termination.

### E.    Plaintiff cannot establish pretext with respect to the termination of Plaintiff's employment.

Because UKHA can show that Plaintiff was terminated for legitimate, non-discriminatory reasons, Plaintiff has the burden to demonstrate that UKHA's reason for terminating his employment is a pretext of intentional discrimination. To show pretext, Plaintiff must offer evidence "to create a genuine factual dispute regarding the veracity of [UKHA's] nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (citation omitted). Plaintiff can meet this burden only by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions [in the employer's] proffered reason for its action that a reasonable fact finder

could rationally find them unworthy of credence" and therefore infer that UKHA's actions were not for the reasons given. *Id.* (quoting *Jaramillo v. Colo . Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)).

Notably, this standard does not permit a court to "second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). Evidence that an employer "was mistaken or used poor business judgment" is insufficient to show that the reason for termination is unworthy of credibility. *Id.* at 970–71. Accordingly, to establish pretext, a plaintiff must produce evidence that suggests more than that the employer "g[ot] it wrong," and must produce evidence to show that the employer "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). A plaintiff's speculation for believing discrimination was a motivating factor cannot survive summary judgment. *See Markley v. U.S. Bank Assoc.*, 59 F.4th 1072, 1083 (10th Cir. 2023). Here, Plaintiff can point to no evidence that would establish UKHA's reason for his termination is unworthy of credence, and accordingly UKHA is entitled to summary judgment.

Despite Plaintiff's speculative beliefs based on his own conspiracy theory that supervisors were "out to get" him, the record is devoid of any evidence that supports an argument of pretext. **(SOF 52-57).** In fact, both individuals that were supposedly "out to get" him are over the age of 40. **(SOF 11, 52).** Barbara MacArthur, for example, made the decision to terminate Plaintiff's employment. **(SOF 161).** MacArthur is 72 years old. **(SOF 11).** Additionally, Plaintiff's direct supervisor at the time of his termination, 55-year-old Becky Captain, had eleven positions report to her in the second half of 2022. **(SOF 11-12).** Almost all of those employees were over the age of 40. **(SOF 12-13).** Plaintiff believes that Captain was trying to get rid of "older managers" based

102952139.4

on gossip he contends he heard through the grapevine. **(SOF 56-57)**. However, Captain did not participate in or make the final termination decision about Plaintiff's employment. **(SOF 159)**. Notably, Plaintiff's position was filled by a 53-year-old. **(SOF 162)**.

UKHA's decision to terminate Plaintiff's employment was based on documented performance issues and an extensive Human Resources investigation into repeated employee complaints about Plaintiff's management and communication problems. **(SOF 79-104)**. Although Plaintiff is unable to accept responsibility for the conduct underlying his termination, it does not alter the fact that, at the time of his termination, the Vice President of Cardiac Services, Chief Operating Officer, and Director of Nuclear Cardiology, all of whom are over 40, were all in agreement that his employment could no longer continue. **(SOF 10-11, 122, 148, 155-158)**.

Additionally, the investigation upon which leadership relied in making its final termination decision was a legitimate process, and leadership was entitled to believe employees' perceptions. **(SOF 79-104)**. Clearly, there was no hidden discriminatory agenda here. Rather, once the investigation concluded and leadership discussed its findings along with Plaintiff's other operational and regulatory missteps, it became clear that Plaintiff's employment had to be terminated. **(SOF 14-17, 79-104, 105-112, 148-154, 155-158)**.

Ultimately, Plaintiff cannot meet his burden of establishing that the decision to terminate his employment occurred because of discriminatory reasons. Accordingly, even if this Court reaches the pretext analysis—which it need not—Plaintiff's claim for age discrimination fails as a matter of law, and UKHA is entitled to summary judgment.

**F.    Plaintiff cannot establish that his termination violated K.S.A. § 65-4928.**

    **1.    Plaintiff did not report a reportable incident in accordance with the statute's language.**

The Kansas Risk Management Act including, specifically, K.S.A. § 65-4928, prohibits the termination of an employee for making a report under K.S.A. § 65-4923. To be afforded protection by K.S.A. § 65-4928, Plaintiff must have reported the incident at issue in accordance with the statute. *See Parker v. Life Care Ctrs. of Am., Inc.*, No. 04-1206-MLB, 2006 WL 8440524 at *5 (D. Kan. Mar. 31, 2006). To make a report under K.S.A. § 65-4923, an employee with knowledge has to report a "reportable incident." Based on the plain language of K.S.A. § 65-4921, a reportable incident is one that is below the applicable standard of care. *See Anglemyer v. Hamilton Cnty. Hosp. Carter*, No. 81,417, 2000 WL 36745791, at *2 (Ct. App. Kan. Feb. 11, 2000) (construing K.S.A. § 65-4928 under its plain and unambiguous language). Such a report of an incident falling below the applicable standard of care must be made to the chief of the medical staff, chief administrative officer, or risk manager of the facility. Kan. Stat. Ann. § 65-4923(a)(2).

In his First Amended Complaint, Plaintiff alleges that he reported incidents of treadmills malfunctioning in accordance with the statute. **(Doc. 17 at ¶ 35-38).** The record, however, is devoid of any evidence to support that allegation. First, Plaintiff cannot show that he reported the incident in accordance with the statute's clear, unambiguous language—Plaintiff testified that he never accused or reported anyone or anything, including UKHA, of violating the standard of care. **(SOF 139-140).** Nor did Plaintiff report the incident to the chief of the medical staff, chief administrative officer, or risk manager of the facility. **(SOF 120-128)** Even reviewing the record generously, Plaintiff cannot fit the facts of his case into the statute's language or purview. Plaintiff had a meeting with Chris Ruder, Chief Operating Officer, in December 2022, *months* after the first report of a treadmill potentially malfunctioning. **(SOF 124).** Notably, Ruder is not the chief administrative officer of UKHA. **(SOF 123).** Additionally, Trang Luu, Risk Manager, did not speak with Plaintiff one-on-one and did not speak with him at initial meetings regarding treadmills.

32

**(SOF 128-129, 135).** In fact, Luu was informed about the treadmills by Holly Grier, Cardiovascular Ultrasound Manager, whom Plaintiff admits raised the issue about the treadmills prior to him. **(SOF 120-121, 124, 127).** As Plaintiff admits he never accused or reported anyone, including UKHA, of falling below the standard of care, UKHA is entitled to summary judgment on Plaintiff's wrongful termination claim.

**2.    Plaintiff was not discharged or terminated for making a report.**

Even if, for argument's sake, Plaintiff did make a report under the statute, which he did not, Plaintiff was not terminated for making any such report. Plaintiff was terminated for legitimate, nondiscriminatory reasons related to his poor performance as a Nuclear Cardiology Director, including issues with communication, lack of regulatory readiness, and poor supervision and management over employees and his department. **(SOF 14-17, 79-104, 105-112, 148-154, 155-158).** The record simply does not support an argument that Plaintiff was terminated for making a report about a treadmill. For instance, similarly situated employees were not demoted, disciplined, or discharged for raising concerns about treadmills. **(SOF 136-138).** Grier, for example, still works at UKHA and reports to Becky Captain. **(SOF 138).** Other UKHA employees who were involved in the treadmill issue are still employed at UKHA. **(SOF 136-137).** In fact, these employees still meet regarding treadmill software. **(SOF 141).** Even now, Plaintiff cannot name an individual terminated for making a report. **(SOF 136).** Accordingly, UKHA is entitled to summary judgment on Plaintiff's Kansas Risk Management Act claim.

## IV.    CONCLUSION

Plaintiff's claims are merely based on his own conspiracies and subjective beliefs that his supervisors were "out to get" him—a theory that lacks support in the record. Plaintiff, throughout his employment, was unable to accept feedback, coaching, or responsibility for issues in his department or problems he manifested with his poor communication and management style.

Plaintiff cannot establish a *prima facie* case of age discrimination, and, even if he could, he cannot meet his burden of establishing that the legitimate, non-discriminatory reasons for UKHA's decision are pretextual. Rather, the evidence overwhelmingly shows that UKHA's reasons for terminating Plaintiff were based on nearly a dozen interviews with concerned employees who said Plaintiff created one of the most stressful and chaotic environments some of them had seen in a workplace. The record is devoid of any evidence of discrimination on the basis of age.

Additionally, Plaintiff cannot show that he made any report of a reportable incident to be afforded the protection of K.S.A. § 65-4928 and, even if Plaintiff is given credit for other employees' reporting of treadmill issues, his employment was not terminated and he cannot show evidence of discharge for any such reporting.

Accordingly, Plaintiff's claim of discrimination under the ADEA and wrongful termination in violation of K.S.A. § 65-4928 fail as a matter of law, and UKHA is entitled to summary judgment on both of his claims.

Respectfully submitted,

POLSINELLI PC

By: */s/  Eric E. Packel*
    ERIC E. PACKEL (#23070)
    MEGHAN H. HANSON (D. KAN. #78869)
    ELIZABETH E. BERG (D. KAN. #79145)
    900 W. 48th Place, Suite 900
    Kansas City, MO 64112
     (816) 753-1000
    Fax No: (816) 753-1536
    epackel@polsinelli.com
    mhanson@polsinelli.com
    eberg@polsinelli.com

ATTORNEYS FOR DEFENDANT

102952139.4

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing pleading was served by (___) United States Mail, postage prepaid; ( <u>X</u> ) ECF Notification System; and/or (___) E-mail this 24th day of April, 2025 to:

Albert F. Kuhl, Esq.
Law Office of Albert F. Kuhl
9393 W. 110th Street, Suite 500
Overland Park, KS  66210
913-638-8022
Fax:  913-369-7714
al@kcjoblawyer.com

ATTORNEYS FOR PLAINTIFF

By: */s/ Eric E. Packel*

102952139.4